(No. 92056.—

DENISE GUILLEN, a Minor, by Suamy Guillen, Her Father and Next Friend, Appellee, v. POTOMAC INSURANCE COMPANY OF ILLINOIS, Appellant.

*Opinion filed January 24, 2003.*

RARICK, J., took no part.

Thomas M. Crisham, John P. O'Malley and David M. Jenkins, of Crisham & Kubes, Ltd., of Chicago, for appellant.

Anthony C. Valiulis and William Macy Aguiar, of Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., of Chicago, for appellee.

Hugh C. Griffin, Thomas W. Jenkins and Stevie A.

Starnes, of Lord, Bissell & Brook, of Chicago (Craig A. Berrington, of Washington, D.C., of counsel), for *amici curiae* The National Association of Independent Insurers and The American Insurance Association.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

Two principal issues are presented in this case: (1) whether an insurer who mails notice to its insured of a material change in an insurance policy, as required under section 143.17a(b) of the Illinois Insurance Code (215 ILCS 5/143.17a(b) (West 1992)), must maintain proof of the mailing on a recognized "U.S. Post Office" (hereinafter, Postal Service) form or form acceptable to the Postal Service or other commercial delivery service; and (2) whether the plaintiff, by virtue of an assignment given by the insured in this case, obtained a right to indemnification from the defendant insurance company.

BACKGROUND

In May 1996, the plaintiff, Denise Guillen (Guillen), a minor, by her father and next friend, Suamy Guillen, filed a complaint against her former landlords, Ezequiel and Maria Ortiz, in the circuit court of Cook County. In her complaint, Guillen alleged that she was a tenant in an apartment owned by the Ortizes for approximately the first two years of her life, from October 19, 1993, until September 1995. During this time, Guillen alleged, she was exposed to deteriorating lead-based paint and paint dust, which was present in the apartment. Guillen asserted that, as a result of this exposure, she suffered severe lead poisoning and permanent developmental injuries. Guillen further alleged that her injuries were proximately caused by the Ortizes' negligent failure to inspect for or remove the lead-based paint.

Shortly after receiving Guillen's complaint, the Ortizes tendered Guillen's claims to their insurer, defendant

Potomac Insurance Company of Illinois (Potomac). Potomac refused the tender and denied any obligation to defend or indemnify the Ortizes. According to Potomac, an endorsement that had recently been added to the Ortizes' commercial liability policy contained a lead exclusion which precluded coverage for Guillen's claims. After refusing the tender and denying coverage, Potomac took no further action with respect to Guillen's complaint. Potomac did not defend under a reservation of rights or file suit seeking a declaration of the rights of the parties.

In July 1997, Guillen and the Ortizes entered into a settlement agreement. Under the terms of the settlement, the Ortizes agreed to pay Guillen the sum of $600,000 in exchange for a release from liability for any claims relating to Guillen's lead poisoning. Importantly, however, the Ortizes' obligation to pay the $600,000 was subject to the condition that it would "be satisfied solely through the assignment" to Guillen of the Ortizes' right to payment from Potomac. The assignment of the Ortizes' right to payment from Potomac was included within the terms of the settlement agreement. No other payment obligation was imposed upon the Ortizes and no judgment was entered against them.

In March 1998, Guillen, as the assignee of the rights of the Ortizes, filed an amended declaratory judgment complaint against Potomac in the circuit court of Cook County. In this action, which is the subject of the instant appeal, Guillen sought a declaration that Potomac was obligated to pay Guillen the $600,000 settlement amount agreed to by the Ortizes. Potomac filed an answer to Guillen's complaint in which it raised numerous affirmative defenses. The parties thereafter filed cross-motions for summary judgment.

In her motion for summary judgment, Guillen alleged that Potomac had failed to comply with the statutory notice requirements that governed the addition of

the lead exclusion. Guillen argued that, under section 143.17a(b) of the Illinois Insurance Code (Code) (215 ILCS 5/143.17a(b) (West 1992)), when an exclusion that materially alters insurance coverage is added to a renewal insurance policy, the insurer must give the policyholder 60 days written notice and must "maintain proof of mailing or proof of receipt [of notice]" to make the alteration effective. Guillen contended that Potomac had failed to maintain the required proof of mailing or proof of receipt and, as a result, could not establish that the Ortizes had been notified of the change in coverage affected by the lead exclusion. Thus, according to Guillen, the lead exclusion never became part of the Ortizes' insurance policy. Because the lead exclusion was not part of the Ortizes' insurance policy, Guillen maintained that Potomac had breached its duty to defend and should be estopped from raising policy defenses to coverage for Guillen's claims against the Ortizes. Finally, Guillen alleged that Potomac's wrongful refusal to defend made it responsible for any reasonable settlement amount agreed to by the Ortizes. And, since the Ortizes had assigned to Guillen their right to recovery from Potomac, Guillen argued that she was entitled to recover the $600,000 settlement amount from Potomac.

In its motion for summary judgment, Potomac disputed Guillen's contention that it had not provided proper notice to the Ortizes regarding the addition of the lead exclusion. Potomac argued that it had notified the Ortizes in writing about the lead exclusion 75 days prior to renewal and that it had maintained sufficient proof of mailing. In support of this contention, Potomac provided the circuit court with an unsigned copy of a letter which was purportedly sent to the Ortizes, and an affidavit from an employee of Potomac that described Potomac's custom and practice with respect to mailing notices of material changes in insurance policies to its insureds.

Potomac additionally argued in its motion for summary judgment that, even if it had breached its duty to defend, it was not required to pay the $600,000 settlement amount agreed to by the Ortizes. According to Potomac, it was under no obligation to pay Guillen because the Ortizes' assignment to Guillen of their right to recovery against Potomac was invalid. Potomac pointed out that under the terms of the Ortizes' insurance policy, Potomac was required to pay "those sums that the insured becomes legally obligated to pay as damages." Potomac argued that the Ortizes were never "legally obligated" to pay anything under the terms of the settlement agreement with Guillen. In support of this contention, Potomac noted that, since the Ortizes' payment obligation under the settlement agreement was limited solely to an assignment of the Ortizes' right to recover under their insurance policy, the Ortizes were never personally obligated to pay any money and, indeed, were never placed in any personal financial risk by the agreement. Potomac argued, therefore, that the Ortizes were not "legally obligated" to pay damages to Guillen in any practical sense of the term and, thus, had no right to indemnification from Potomac. Potomac further noted that Guillen, as the assignee of the Ortizes' rights against Potomac, "stood in the shoes" of the Ortizes. Therefore, Potomac argued, since the Ortizes had no right to recover from Potomac, neither did Guillen.

In a written order dated June 26, 2000, the circuit court found that, with respect to the lead exclusion, Potomac had not satisfied the notice requirements of section 143.17a(b) of the Code. The court concluded that the unsigned letter and employee affidavit offered by Potomac failed to show that Potomac had "maintain[ed] a contemporaneous proof of mailing" as required under the statute. The court further reasoned that, because of Potomac's failure to comply with the notice requirements

of the Code, the lead exclusion never became a part of the Ortizes' insurance policy. Consequently, the circuit court found that Potomac had a duty to defend the underlying lawsuit brought by Guillen, that Potomac had breached that duty, and that Potomac was estopped from raising policy defenses to coverage.

The circuit court further found, however, that Guillen had failed to establish the elements of a *prima facie* claim for indemnification against Potomac. The circuit court concluded that, because the Ortizes' payment obligation under the settlement was limited to the assignment, the Ortizes had not "incurred any liability for damages with respect to the Guillen lawsuit" and therefore had no right to assert a cause of action for indemnity against Potomac. The circuit court also noted that Guillen, as the assignee of the Ortizes' rights against Potomac, could have no greater claim against Potomac than the Ortizes themselves had. Thus, because Potomac owed no duty to indemnify the Ortizes, the court concluded that Potomac was not liable to Guillen. The circuit court therefore granted Potomac's motion for summary judgment.

On appeal, the appellate court reversed the circuit court's grant of summary judgment in favor of Potomac. 323 Ill. App. 3d 121. Initially, the appellate court addressed whether Potomac had established that it provided the Ortizes with notice of the lead exclusion. In deciding whether Potomac had adhered to the notice requirements of section 143.17a(b) with respect to the lead exclusion, the appellate court turned to subsection (a) of the statute, which governs an insurer's notice obligations when it chooses not to renew an insurance policy. Subsection (a) states that "proof of mailing" notice of nonrenewal shall be maintained on "a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service." 215 ILCS 5/143.17a(a) (West 1992). Subsection (b), which deals with notice of a

material policy change, also states that the insurer must maintain "proof of mailing" but does not repeat the definition of that term which is set forth in subsection (a). Concluding that the words "proof of mailing" should be given the same meaning throughout the statute, the appellate court held that an insurer who attempts to prove that it mailed notice of a material policy change under subsection (b) must show that it maintained proof of mailing on a form acceptable to the Postal Service or other commercial mail delivery service. Since Potomac failed to show proof of mailing on such a form with respect to the lead exclusion, the appellate court concluded, like the circuit court, that the exclusion never became part of the Oritzes' insurance policy and that Potomac had therefore breached its duty to defend. 323 Ill. App. 3d at 131.

However, the appellate court reversed the circuit court's holding that Guillen had failed to state a *prima facie* claim for indemnification against Potomac. Potomac argued before the appellate court, as it did in the circuit court, that because of the nature of the settlement agreement between the Ortizes and Guillen, the Ortizes were under no "legal obligation" to pay any damages to Guillen. Therefore, according to Potomac, the Ortizes had no right to indemnification from Potomac and had nothing to assign to Guillen. The appellate court rejected these arguments and held that the Ortizes had a right to indemnification from Potomac and that they had properly assigned this right to Guillen. In so holding, the appellate court emphasized that the issue of the Ortizes' right to indemnification and the validity of their assignment to Guillen could not be considered "in a vacuum" but had to be considered in light of the fact that Potomac had breached its duty to defend. 323 Ill. App. 3d at 135.

Finally, the appellate court observed that courts have raised concerns about the possibility of collusion between

an insured and an injured plaintiff who agree to settle a claim following an insurer's breach of the duty to defend. 323 Ill. App. 3d at 132-33, citing *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 637 (1994). Thus, the appellate court noted, an insurer may challenge a settlement made in its absence—even though the insurer's absence was caused by its own breach of the duty to defend—on the basis that either the decision to settle or the settlement amount was unreasonable. 323 Ill. App. 3d at 133. Applying these principles to the case at bar, the appellate court concluded that the Ortizes' decision to settle with Guillan was made "in reasonable anticipation of liability" and was not subject to challenge by Potomac. However, the appellate court remanded the cause to the circuit court for a hearing to determine whether the settlement amount agreed to by the Ortizes was reasonable. 323 Ill. App. 3d at 137-38.

Potomac subsequently filed a petition for leave to appeal, which we allowed (177 Ill. 2d R. 315).

## ANALYSIS

The circuit court's entry of summary judgment is subject to *de novo* review. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). The construction of an insurance policy, which is a question of law, is also reviewed *de novo*. *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479-80 (1997).

At the outset, Guillen acknowledges the general rule which holds that, in the absence of a breach of the duty to defend, an insured must obtain the consent of the insurer before settling with an injured plaintiff. See, *e.g.*, *Thornton v. Paul*, 74 Ill. 2d 132, 144 (1978); *Alliance Syndicate, Inc. v. Parsec, Inc.*, 318 Ill. App. 3d 590, 600 (2000). Guillen concedes that in this case, if Potomac did not breach its duty to defend the Ortizes, then the Ortizes' decision to settle with Guillen has no binding effect upon Potomac. Accordingly, we first consider whether Po-

tomac breached its duty to defend the Ortizes against Guillens' complaint.

### Duty to Defend

In determining whether an insurer owes its insured a duty to defend, a court looks to the allegations contained in the underlying complaint against the insured and compares those allegations to the relevant coverage provisions of the insurance policy. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 393 (1993). If the facts alleged in the underlying complaint fall within or potentially fall within the coverage of the policy, the insurer's duty to defendant is triggered. *Outboard Marine*, 154 Ill. 2d at 108.

As noted, the complaint at issue in this case was filed against the Ortizes by Guillen in May 1996. In that complaint, Guillen alleged that she suffered serious injuries after being exposed to lead-based paint and paint dust in the Ortizes' apartment from approximately October 19, 1993, to September 1995. The complaint alleged that Guillens' injuries were caused by the Oritzes' negligent failure to inspect for or remove the lead-based paint.

The relevant insurance policies in this case are commercial general liability policies that were issued by Potomac to the Ortizes from 1991 through 1994. The Ortizes' initial insurance policy was issued by Potomac for the period of October 12, 1991, to October 12, 1992. Two renewal policies were subsequently issued for the period of October 12, 1992, to October 12, 1993, and for October 12, 1993, to October 23, 1994.

As it did in the courts below, Potomac maintains in this court that it sent a letter to the Oritzes on July 28, 1993, in which it notified them that a lead liability exclusion would take effect in their October 12, 1993, renewal policy. The lead exclusion stated, in pertinent part, that

"This insurance does not apply to:

1. **'Bodily injury', 'property damage', 'personal injury',** or **'advertising injury'** arising out of, resulting from, or in any way caused or contributed to by the actual, alleged or threatened ingestion, inhalation, absorption of, exposure to or presence of lead in any form emanating from any source \*\*\*." (Emphasis in original.)

Potomac maintains that the lead exclusion clearly precluded coverage for claims such as those brought by Guillen. Moreover, according to Potomac, because the exclusion took effect on October 12, 1993, and Guillen's complaint alleges that her injuries began October 19, 1993, the underlying complaint did not fall within the Ortizes' policy language. Accordingly, Potomac contends that the Ortizes had no coverage and Potomac had no duty to defend.

Guillen maintains, however, that Potomac failed to comply with the notice requirements of section 143a of the Code with respect to the lead exclusion. Section 143a of the Code provides, in pertinent part:

"§ 143.17a. Notice of Intention Not to Renew. a. No company shall fail to renew any policy of insurance \*\*\* unless it shall send by mail to the named insured at least 60 days advance notice of its intention not to renew. *The company shall maintain proof of mailing of such notice on one of the following forms: a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service.* \*\*\*

b. \*\*\* [N]o company may increase the renewal premium on any policy of insurance \*\*\* by 30% or more, nor impose changes in deductibles or *coverage that materially alter the policy,* unless the company shall have mailed or delivered to the named insured written notice of such increase or change in \*\*\* coverage at least 60 days prior to the renewal or anniversary date. \*\*\* An exact and unaltered copy of such notice shall also be sent to the insured's broker \*\*\*. *The company shall maintain proof of mailing or proof of receipt whichever is required.*" (Emphases added.) 215 ILCS 5/143.17a(a), (b) (West 1992).

Mirroring the reasoning of the appellate court,

Guillen contends that, under subsection (b) of section 143.17a, the term "proof of mailing" must be defined as it is under subsection (a), *i.e.*, a form acceptable to the Postal Service or other commercial mail delivery service which shows that notice was mailed. Applying this definition, Guillen argues that Potomac has failed to establish that it notified the Ortizes of the lead exclusion because Potomac has not presented an acceptable form which shows that the notice was mailed. Thus, Guillen contends that Potomac did not satisfy the notice requirements of section 143.17a(b), that the lead exclusion never took effect, and that Potomac breached its duty to defend the Ortizes. We agree.

Subsection (a) of section 143.17a defines an insurer's obligation to provide notice to its insured when the insurer chooses not to renew an insurance policy. Subsection (a) requires the insurer to "maintain proof of mailing" of the nonrenewal notice on "a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service." 215 ILCS 5/143.17a(a) (West 1992). Subsection (b), which governs the notice requirements for material changes to policies, repeats the same words, "proof of mailing," found in subsection (a) but does not repeat the definition set forth in subsection (a). However, this court has held that, "[u]nder basic rules of statutory construction, where the same words appear in different parts of the same statute, they should be given the same meaning unless something in the context indicates that the legislature intended otherwise." *McMahan v. Industrial Comm'n*, 183 Ill. 2d 499, 513 (1998), citing *People v. Talbot*, 322 Ill. 416, 422 (1926). Applying this general rule, as the appellate court below did, leads to the conclusion that the term "proof of mailing" should be given the same meaning in both subsection (a) and subsection (b).

Potomac does not dispute the general rule of statu-

tory construction set forth above but, instead, questions its application in the case at bar. Potomac contends that, in this case, the context of section 143.17a indicates that the legislature intended that a different meaning of "proof of mailing" be applied in subsection (b) from that found in subsection (a). Potomac maintains that a material policy modification is a less serious transaction than a policy nonrenewal because the latter leaves the insured without any insurance whatsoever while the former does not. Thus, Potomac argues, it is reasonable to conclude that the legislature imposed less stringent notice requirements on insurers with respect to material modifications than policy nonrenewals. Potomac contends, therefore, that the term "proof of mailing" found in subsection (b) is not limited to Postal Service forms or commercial delivery forms but may also include other forms of proof such as an insurer's custom and practice with respect to mailing. We disagree.

It is true, as Potomac notes, that subsection (b) of section 143.17a addresses material modifications to insurance policies rather than policy nonrenewals. However, by definition, a material modification to an insurance policy is one that makes significant changes to that policy. Moreover, in most cases, the material modification made by the insurer will not be a change that increases coverage but, instead, will be a partial cancellation or reduction in coverage for the insured. The material modification may be equally as significant from the perspective of the insured as a policy nonrenewal would be. Indeed, the attempted modification at issue in this case, the lead exclusion, would be significant from the Ortizes' point of view since it would have eliminated coverage for an entire category of serious claims brought against them.

A material alteration of an insurance policy is an important transaction that may have a serious effect on the interests of the insured. Recognizing this, the

legislature imposed the notice requirements for material modifications to protect the insured from cancellation or reduction of certain coverage without the insured's knowledge. Given these facts, we cannot agree with Potomac's contention that material policy modifications are, as a general matter, so lacking in importance compared to policy nonrenewals that the words "proof of mailing" should be read as having different meanings under subsection (a) and subsection (b).

We note, too, that there are other, affirmative, reasons to conclude that the words "proof of mailing" should be given the same meaning in both subsection (a) and subsection (b). For example, one benefit provided by the simple, defined "proof of mailing" standard found in subsection (a) is that it helps avoid evidentiary disputes and wasteful litigation over whether notice of the nonrenewal was actually provided the insured. By applying the definition of "proof of mailing" found in subsection (a) to subsection (b), that same benefit can be afforded to disputes regarding notice of material modifications.

In light of the above, we discern no compelling reason to depart from the general rule which holds that when the same words appear in different places in a statute they should be given the same meaning. See *McMahan*, 183 Ill. 2d at 513. We therefore agree with the appellate court's determination that an insurer who mails notice to its insured of a material change in an insurance policy pursuant to section 143.17a(b) of the Code must maintain proof of the mailing on a recognized Postal Service form or form acceptable to the Postal Service or other commercial delivery service.

In the case at bar, it is undisputed that Potomac did not maintain proof that it mailed the lead exclusion on a form acceptable to the Postal Service or other commercial delivery service. However, Potomac contends that this failure is of no moment because the legislature has not

provided a remedy for an insurer's failure to comply with the notice requirements regarding material modifications. In support of this contention, Potomac points to subsection (c) of section 143.17a, the provision which governs the remedies to be applied when the notice provisions of section 143.17a are violated. Subsection (c) provides:

"c. Should a company fail to comply with the notice requirements of this Section, the policy shall terminate only as provided in this subsection. In the event notice is provided at least 31 days, but less than 60 days prior to expiration of the policy, the policy shall be extended for a period of 60 days or until the effective date of any similar insurance procured by the insured, whichever is less, on the same terms and conditions as the policy sought to be terminated. In the event notice is provided less than 31 days prior to the expiration of the policy, the policy shall be extended for a period of one year or until the effective date of any similar insurance procured by the insured, whichever is less, on the same terms and conditions as the policy sought to be terminated unless the insurer has manifested its willingness to renew at a premium which represents an increase not exceeding 30%." 215 ILCS 5/143.17a(c) (West 1992).

Potomac notes that subsection (c) does not expressly refer to the notice requirements for material modifications or what remedy should be afforded when an insurer fails to comply with those requirements. Potomac contends, therefore, that the appellate court "crafted an unenumerated remedy into subparagraph (c)" when the court concluded that Potomac's failure to comply with the proof of mailing requirement of subsection (b) meant that the lead exclusion never became a part of the Ortizes' insurance policy.

This court has previously recognized the importance of the insurer's obligation to provide notice to its insured of changes that materially diminish insurance coverage. See *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d

342 (1998) (addressing section 143.14a). The notice requirements of the Code are not mere technicalities, but are important provisions enacted by the legislature to protect insureds from having significant changes made to their insurance coverage without their knowledge. *Ragan*, 183 Ill. 2d at 351. Further, where, as here, the legislature has determined that a particular form of proof is required to prove notice, the legislature has struck a public policy balance between the needs of the insured and the insurer. By requiring a defined "proof of mailing," the legislature helps secure the insured's right to notification while, at the same time, imposing only "a very low threshold of proof" upon the insurer. *Ragan*, 183 Ill. 2d at 351-52. Because of this policy determination, in these situations, "[t]here is no alternative method for proving compliance with the proof of mailing requirements other than to maintain the proof of mailing" defined in the statute. *Ragan*, 183 Ill. 2d at 351. Given the importance attached to the notice requirements under the Code, and the public policy considerations reflected in the legislature's decision to define the specific notice requirements under subsection (b), we reject Potomac's suggestion that no consequences flow from an insurer's failure to comply with those provisions.

Both parties in the case at bar discuss the possibility that, under subsection (c), when an insurer fails to give an insured notice of a material modification to a renewal insurance policy, then the remedy afforded is that the entire renewal policy is not activated and the insured's *previous* insurance policy remains in effect. We note that this remedy is not well suited to a violation of the notice provisions pertaining to material modifications. If the remedy of continuing the previous insurance policy were applied to breaches of notice of material modifications, then the statutory breach would void not just the

modification but the entire renewal policy as well. This would be true even though the statutory violation had nothing to do with the renewal policy as a whole and even though the insured otherwise had notice of the renewal policy. Although the remedy of having the previous insurance policy continue in effect is clearly required when an insurer breaches the notice provisions for policy nonrenewals, we think it unlikely that the legislature intended such a result for breaches pertaining to policy modifications.

Subsection (c) clearly provides that, when notice requirements are not met with respect to the attempted nonrenewal of an insurance policy, the nonrenewal does not take effect. We think it reasonable to conclude that the legislature intended the same logic to apply with regard to an attempted material policy modification. That is, as both the appellate and circuit courts below determined, when a notification requirement is not satisfied with respect to a material modification to an insurance policy, the modification does not take effect. *Cf. Ragan*, 183 Ill. 2d 342 (insurer's failure to maintain proof of mailing of policy cancellation rendered that cancellation invalid). We note that this result provides both an incentive to the insurer to comply with the notice requirements of subsection (b) and an appropriately tailored remedy to the insured for an insurer's breach of those requirements.

In the instant case, Potomac failed to maintain the "proof of mailing" required under section 143.17a(b) when it attempted to modify the Ortizes' insurance policy to add the lead exclusion. Accordingly, that modification never became a part of the insurance policy. Potomac therefore breached its duty to defend the Ortizes from Guillen's claims and is estopped from raising policy defenses to coverage. *Clemmons v. Travelers Insurance Co.*, 88 Ill. 2d 469, 475 (1981).

### Validity of the Assignment

Potomac next argues that, even if it breached its duty to defend the Ortizes, it is entitled to summary judgment because the assignment given by the Ortizes to Guillen is invalid. The settlement agreement between Guillen and the Ortizes contains the following provisions relating to the assignment:

"1. **Payment**. Subject to paragraph 10 below [requiring court approval of the settlement], Defendants will pay Plaintiff the sum of $600,000.00, to be satisfied solely through the assignment to Plaintiff reflected in Paragraph 2 below.

2. **Assignment**. Defendant hereby assigns to Plaintiff, to the fullest extent permitted by law or otherwise, all of their rights to payment if any, from General Accident Insurance ("General") under that certain Business Owners Policy of insurance [ ] issued to Defendants MARIA G. ORTIZ AND EZEQUIEL B. ORTIZ, by General, arising out of the claims asserted against Defendants in the Action or the settlement thereof." (Emphasis in original.)

As it did in the lower courts, Potomac notes before this court that an assignee "stands in the shoes" of the assignor and can have no greater rights than those possessed by the assignor. Thus, Potomac observes, for Guillen to state a *prima facie* claim for indemnification against Potomac, she must first establish that the Ortizes themselves possessed a right to indemnification. Potomac contends that Guillen cannot meet this burden.

Potomac points out that, under the terms of the Ortizes' insurance policy, Potomac was required to indemnify the Ortizes for those sums which they were "legally obligated to pay as damages." Potomac does not dispute that, generally speaking, once an insurer breaches its duty to defend, the insured may enter into a reasonable settlement agreement without foregoing its right to seek indemnification. See *Outboard Marine*, 154 Ill. 2d at 128. Potomac concedes that, in such a case, if the payment obligation of the insured is not limited by an assignment,

the settlement agreement would create a legal obligation on the part of the insured to pay damages.

Potomac argues, however, that in this case, the Ortizes were never "legally obligated" to pay damages under the terms of their settlement agreement with Guillen because their payment obligation was limited solely to an assignment of the Ortizes' right to recover under their insurance policy. Potomac observes that, because of the assignment, the Ortizes were never personally obligated to pay any money and were never placed in any personal financial risk. This is in contrast, Potomac notes, with a settlement that does not contain such an assignment. In that situation, the insured is placed in financial risk because, unless the insured can prove the insurer breached the duty to defend, the insured will be personally responsible for the amount of the settlement. Potomac contends, however, that in this case, the assignment effectively extinguished the Ortizes' legal obligation to pay damages. Potomac maintains, therefore, that the Oritzes were not legally obligated to pay damages in any real or practical sense of those words, that they suffered no insurable loss, and that they had no right to indemnification. Thus, since Guillen stands in the shoes of the Ortizes, Potomac argues that she cannot state a *prima facie* claim for indemnification.

Potomac's argument regarding the validity of the Ortizes' assignment presents a question: How should the "legally obligated to pay" language be interpreted when an insurer breaches its duty to defend? Although this is a question of first impression in this court, numerous courts in other jurisdiction have considered it, albeit in a somewhat different context from that presented here. Most often, the interpretation of the "legally obligated to pay" language has arisen when the insured and the injured plaintiff enter into a settlement agreement consisting of a stipulated judgment or consent judgment

joined with a covenant not to execute and an assignment of the insured's rights against the insurer to the injured plaintiff. See generally C. Wood, *Assignments of Rights and Covenants Not to Execute in Insurance Litigation*, 75 Tex. L. Rev. 1373 (1997); J. Harris, *Judicial Approaches to Stipulated Judgments, Assignments of Rights, and Covenants not to Execute in Insurance Litigation*, 47 Drake L. Rev. 853 (1999).

When confronted by a settlement agreement consisting of a stipulated judgment, an assignment and a covenant not to execute, insurers have maintained, as Potomac does here, that the covenant not to execute effectively extinguishes the insured's legal obligation to pay since the insured "has no compelling obligation to pay any sum to the injured party." *Freeman v. Schmidt Real Estate & Insurance, Inc.*, 755 F.2d 135, 138 (8th Cir. 1985). The majority of courts, however, have rejected this argument. See, *e.g.*, 47 Drake L. Rev. at 858 (the trend leans "overwhelmingly" to the rule that the insured remains "legally obligated to pay" when the settlement consists of a stipulated judgment, an assignment, and a covenant not to execute); 75 Tex. L. Rev. 1373; *Gainsco Insurance Co. v. Amoco Production Co.*, 53 P.3d 1051, 1060-61 (Wyo. 2002) (collecting cases).

The construction of the "legally obligated to pay" language adopted by the majority of courts is a technical, rather than practical, one. Courts accepting the conclusion that the insured remains "legally obligated to pay" when the settlement consists of a judgment, covenant not to execute, and an assignment hold that a covenant not to execute is a contract and not a release. The insured still remains liable in tort and a breach of contract action lies if the injured party seeks to collect on the judgment. 47 Drake L. Rev. at 858. Thus, under this construction, the insured is still "legally obligated" to the injured plaintiff, and the insured retains the right to indemnification from the insurer.

The rationale supporting this technical construction of the "legally obligated to pay" language is that "an insurer who has abandoned the insured by refusing to defend a claim should not be allowed to 'hide behind' the policy language." *Gainsco*, 53 P.3d at 1060-61 (and cases cited therein). Further, some courts have observed that if the "legally obligated to pay" language were construed in favor of the insurers, it would defeat the very purpose of the settlement agreement entered into by the insured. See, *e.g.*, *State Farm Mutual Automobile Insurance Co. v. Paynter*, 593 P.2d 948, 953 (Ariz. App. 1979). And, since the insured has the right to protect itself after the insurer breaches its duty to defend, public policy generally supports giving a technical construction to the "legally obligated to pay" language. See, *e.g.*, 75 Tex. L. Rev. at 1384. Thus, the prevailing view is that a liberal construction of the words "legally obligated to pay" in favor of the insured is appropriate, once the insurer has breached its duty to defend.

We agree with the majority view regarding the construction given the "legally obligated to pay" language. Once the insurer has breached its duty to defend, it is in no position to demand that the insured be held to a strict accounting under the policy language. Fairness requires that the insured, having been wrongfully abandoned by the insurer, be afforded a liberal construction of the "legally obligated to pay" language.

In the case at bar, the Ortizes agreed to pay Guillen the sum of $600,000 to be paid solely from an assignment of the Ortizes' rights against Potomac given to Guillen. Technically speaking, the assignment did not release the Ortizes' from their obligation to pay Guillen $600,000. Instead, it simply limited the assets against which Guillen could collect the $600,000. The assignment did not negate the payment obligation itself. It is true that, in practical terms, the Ortizes never faced any

personal financial risk under the settlement agreement. However, because Potomac breached its duty to defend, the Ortizes are entitled to have the "legally obligated to pay" language liberally construed in their favor. Applying that construction here, the Ortizes remained "legally obligated to pay" under the terms of the insurance policy. Accordingly, Potomac's argument that it has no duty to indemnify the Ortizes, because the Ortizes had no "legal obligation to pay," fails.

Potomac also attacks the validity of Ortizes' settlement with Guillen based on public policy. Potomac argues that, in settlement agreements such as the one at issue in the case at bar, the insured's own money is never at risk and, therefore, the insured has no incentive to contest liability or damages with the injured plaintiff. According to Potomac, since the insured is essentially paying with the insurer's money, the insured can, and will, agree to any amount of damages the injured plaintiff requests. For this reason, Potomac contends that settlements such as those at issue here create an environment that fosters collusion and fraud. Thus, Potomac maintains that the agreement between the Ortizes and Guillen should be invalidated as against public policy.

> "In deciding whether an agreement violates public policy, courts determine whether the agreement is so capable of producing harm that its enforcement would be contrary to the public interest. [Citation.] The courts apply a strict test in determining when an agreement violates public policy. *J&K Cement Construction, Inc. v. Montalbano Builders, Inc.*, 119 Ill. App. 3d 663, 683 (1983). The power to invalidate part or all of an agreement on the basis of public policy is used sparingly because private parties should not be needlessly hampered in their freedom to contract between themselves. *First National Bank v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 359 (1997). Whether an agreement is contrary to public policy depends on the particular facts and circumstances of the case." *Kleinwort Benson of North America, Inc. v. Quantum Financial Services, Inc.*, 181 Ill. 2d 214, 226 (1998).

Potomac's concern regarding the possibility of collusion in the type of settlement agreement at issue in the case at bar is well taken. See generally 75 Tex. L. Rev. at 1385-87 ("neither party [to the settlement agreement] is motivated to seriously negotiate over issues of damages and liability because the end goal is to structure the deal so that the carrier, a nonparty to the agreement, pays"); *State Farm Fire & Casualty Co. v. Gandy*, 925 S.W.2d 696 (Tex. 1996). Nevertheless, we do not find the concern regarding the possibility of collusion compelling enough to warrant voiding the instant settlement agreement. As a majority of courts have recognized, the risk of collusion and fraud can be lessened in cases such as those at bar, if not avoided altogether, by placing a requirement upon the plaintiff to prove that the settlement it reached with the insured was reasonable before that settlement can have any binding effect upon the insurer. See generally 75 Tex. L. Rev. 1373; 47 Drake L. Rev. 853.

The criteria for establishing the reasonableness of a settlement agreement in the present context varies somewhat among jurisdictions. Ultimately, however, with respect to the insured's decision to settle, the litmus test must be whether, considering the totality of the circumstances, the insured's decision "conformed to the standard of a prudent *uninsured*." (Emphasis added.) *Rhodes v. Chicago Insurance Co.*, 719 F.2d 116, 120 (5th Cir. 1983). Similarly, with respect to the amount of damages agreed to, the test "is what a reasonably prudent person in the position of the [insured] would have settled for on the merits of plaintiff's claim." *Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn. 1982). This involves a commonsense consideration of the totality of "facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." *Miller*, 316 N.W.2d at 735. We note that the burden of proving reasonableness is properly placed upon the plaintiff both out of fairness,

since the plaintiff was the one who agreed to the settlement, and out of practicality, since, as between the plaintiff and the insurer, the plaintiff will have better access to the facts bearing upon the reasonableness of the settlement. Further, we note that the insurer retains the right to rebut any preliminary showing of reasonableness with its own affirmative evidence bearing on the reasonableness of the settlement agreement.

Like the appellate court, we agree that the matter at bar must be remanded to the circuit court for further proceedings bearing on whether the settlement agreement between the Ortizes and Guillen was reasonable under the circumstances. However, in certain respects, we depart from the appellate court's holding regarding the remand hearing. As noted, the appellate court in the case at bar, looking primarily at the face of the complaint filed by Guillen against the Ortizes, concluded that the Ortizes' decision to settle with Guillen was reasonable as a matter of law and was not subject to challenge by Potomac. Unlike the appellate court, we cannot conclude that the face of the complaint filed by Guillen is sufficient to establish, as a matter of law, that the Ortizes acted as a prudent uninsured when they decided to settle with Guillen. We note, too, that Potomac has not had an opportunity to present any evidence on the issue of the reasonableness of the Ortizes' decision to settle. Accordingly, we order that the judgment of the appellate court is to be modified. On remand, the circuit court shall consider both whether the Ortizes' decision to settle and whether the amount of damages were reasonable.

Finally, with respect to the reasonableness of the amount of damages, we note that the appellate court below stated, as a general proposition of law, that if the settlement amount falls below the policy limits, "the settlement amount is upheld as reasonable." 323 Ill. App. 3d at 137. This is too broad a standard to apply in the

context of settlement agreements such as those at bar. The fact that the amount of damages agreed to is within the policy limits does not, by itself, establish that the damages are what a reasonably prudent person in the position of the insured would have settled for on the merits of the plaintiff's claim.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed as modified. The cause is remanded to the circuit court for further proceedings consistent with this opinion.

*Appellate court judgment affirmed as modified; cause remanded.*

JUSTICE RARICK took no part in the consideration or decision of this case.